**EXHIBIT A**

Confidential

## SUPPLY AGREEMENT

**THIS SUPPLY AGREEMENT** (the "Agreement") is entered into this 30th day of April 2021, by and between Workhorse Technologies Inc., a corporation organized and existing under the laws of the State of Ohio, USA, with offices at 100 Commerce Drive, Loveland, Ohio 45140 ("Buyer") and **COULOMB SOLUTIONS, INC.**, a corporation organized and existing under the laws of the State of California, USA, with offices at 235 Wright Brothers Ave, California, USA 94551 ("CSI"), referred to herein as ("Seller").

WITNESSETH:

**WHEREAS,** Seller is the North American distributor for Contemporary Amperex Technology Co., Limited's ("CATL") batteries for commercial vehicles and is experienced in the distribution, application support, and service of CATL's battery products for use in commercial vehicles; and

**WHEREAS,** Buyer is in the business of manufacturing and selling electric vehicles for commercial and industrial applications; and

**WHEREAS,** Buyer desires to purchase from Seller certain products as more fully defined below, for electric vehicles for commercial and/or industrial applications, and Seller desires to sell such products to Buyer, all upon and subject to the terms and conditions more fully set forth below.

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and intending to be legally bound thereby, Buyer and Seller agree as follows:

1. **PURCHASE AND SALE OF BATTERY PRODUCTS**

Buyer desires to receive the pricing on the Battery Products as set forth on Exhibit C (the "Pricing Schedule") during the Term (as defined in Section 4) of this Agreement and in order to receive such pricing, Buyer agrees as follows:

Minimum Capacity Commitment – Buyer agrees to purchase from Seller and Seller agrees to sell to Buyer, an agreed upon combined minimum kWh capacity (the agreed upon minimum kWh capacity is referred to in this Agreement as the "Minimum Capacity Commitment") of those battery products set forth on Exhibit A (the "Battery Products"), or any future Battery Products offered by Seller and desired by Buyer. During the year 2021), Buyer's Minimum Capacity Commitment shall be ███████. Buyer's Minimum Capacity Commitment for any successive calendar year shall be agreed upon by the parties 120 days prior to the end of each calendar year. Buyer agrees that if Buyer fails to purchase the full Minimum Capacity Commitment for the applicable year for any reason other Buyer's early termination of this Agreement pursuant to

EXHIBIT "A"

Confidential

Section 15, then Buyer shall pay to Seller an amount equal to the sum of (X) the difference between (1) the aggregate purchase price paid by Buyer to Seller during the applicable calendar year and (2) what the aggregate purchase price would have based on the price (per the Pricing Schedule) that corresponds to the actual kWh capacity purchased by Buyer during such calendar year (this difference between (1) and (2) being the "Shortfall"), plus (Y) a carrying cost and administration fee equal to ▮▮▮▮▮▮▮. For this purpose, unfilled Firm Obligations (as specified in Section 7a) as of the end of the applicable calendar year shall be treated as a purchase in such calendar year.

2. **PRICES, PRICE ADJUSTMENTS, AND DELIVERY**
   a. Pricing - All prices shall be DDP Port of Los Angeles. Other Port locations are negotiable but subject to separate pricing agreements. The prices to be charged to Buyer for the Battery Products are set forth on Exhibit C ; provided, however, the prices set forth on Exhibit C are only firm through the end of the Term of this Agreement. Based on Buyer's Minimum Capacity Commitment for calendar 2021 (as specified in Section 1a), Buyer shall purchase Battery Products from Seller at the volume price of ▮▮▮▮▮▮▮, including warranty and travel costs, during calendar year of 2021.  Pricing for calendar 2022 and beyond will be based upon Buyer's Minimum Capacity Commitment for that calendar year and the Pricing Schedule in Exhibit C.  All prices are in United States Dollars.  Except as specifically provided to the contrary in this Section 2, such pricing per kWh shown in Exhibit C shall remain firm throughout the Term of this Agreement, except for modifications due to the following items:

      i. US import tariff on the relevant item(s) at the time of delivery DDP Port of Los Angeles. The battery prices are based upon a current 10.9% tariff and, in the event that there is a change in such tariff amount at the time the Battery Products are received into the United States, then a corresponding proportional adjustment shall be made to such prices.

   b. Delivery: Title and risk of loss shall transfer to the Buyer upon tender of the products to Buyer DDP, CSI warehouse near the Port of Los Angeles per Incoterms 2020.  For the avoidance of doubt, CSI shall be responsible for paying all duties and tariffs and clearing US customs.  CSI will then notify Buyer that the shipment is ready for pickup.  Buyer will then take possession and shall be responsible for transportation to Buyer's desired location. Claims for products damaged or lost in transit after tender to Buyer should be made by Buyer to the carrier, as CSI's responsibility ceases upon tender of goods to Buyer, Buyer's representative or common carrier.

   c. If Seller fails to meet the delivery requirements set forth on Exhibit B, Seller shall pay to Buyer, as liquidated damages, an amount equal to 5% of the price of the Battery Products

Confidential

that were not timely delivered; provided, however, Seller shall not be obligated to pay the liquidated damages if (i) the failure to timely deliver is on account of a force majeure event or (ii) the Buyer requested expedited delivery. Buyer shall provide Seller with an invoice detailing the penalty calculation. Any amount due from Seller to Buyer hereunder shall be applied on Seller's next invoice to Buyer and, if no additional invoices will be sent by Seller, then the amount shall be paid by Seller to Buyer within five (5) business days after Seller's approval of Buyer's invoice.

3. **INVOICING AND PAYMENT**

Invoices shall be issued by Seller to Buyer for each order of Battery Products according to the following terms. Unless otherwise mutually agreed in writing, the payment terms shall be: a) ███████ submission of purchase order by Buyer to Seller (the "Upfront Payment"), provided that, if Buyer provides Seller with a letter of credit in form and amount acceptable to Seller in its sole discretion, then Buyer may make the Upfront Payment 5 days before the Battery Products are shipped from CATL and b) ███████ after delivery of the Battery Products to Buyer.

Payment of invoices by Buyer shall not be delayed for any reason or contingent upon Buyer's receipt of any payment from or action by any other party. Buyer agrees to pay all costs associated with collection including reasonable attorney's fees, if Buyer is in breach of its payment obligations hereunder.

4. **TERM**

The term of this Agreement shall commence on the date first set forth above and shall continue through December 31, 2024 (the "Term") unless sooner terminated pursuant to Section 15.

5. **CHANGES**

Buyer may at any time, by a written notice, request changes in the specifications, designs or drawings, samples or other descriptions to which the Battery Products are to conform, in methods of shipment and packaging, or place of delivery. If Seller agrees to such change in writing, and any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this Agreement, an equitable adjustment shall be made in the price of the Battery Products or the delivery schedule, or both, and this Agreement shall be modified in writing accordingly. Any claim by Seller for an adjustment must be made in writing and mutually agreed prior to Buyer issuing or Seller accepting any purchase orders for such modified items. If the parties are unable to agree upon an equitable adjustment to pricing or other terms, then Seller shall not be obligated to implement any such changes and this Agreement shall remain in full force and effect without modification.

Confidential

6. **DELEGATION AND ASSIGNMENT**

   Neither party hereto may assign any of its rights or obligations under this Agreement, including any assignment by operation of law, without the prior written consent of the other party.

7. **ORDERING/ FORECASTS/ DELIVERY**
   a. Blanket Order/Forecast/Binding Period:  This Agreement for Buyer to purchase the Minimum Capacity Commitment during the year 2021 (and any additional capacity commitments for future years) shall be considered a firm, non-cancelable "blanket order." Buyer has provided Seller with a twelve (12) month rolling forecast setting forth the quantities of each Product and the delivery dates for the Battery Products, a copy of which is attached is Exhibit B. If a specific day of the month is not set forth on Exhibit B, then the delivery date is deemed to be the last day of the applicable month.  Such quantities shall be considered firm and binding ("Firm Obligations") when they are within 120 days of the current date.  Notwithstanding the foregoing, Buyer shall have the right to cancel, adjust or reschedule the quantities of Battery Products shown in Exhibit B, except that it may not cancel, adjust or reschedule the quantity of Battery Products which have become Firm Obligations.  Each time Buyer makes a change to the delivery schedule, Exhibit B shall be updated accordingly.

   b. Delivery Schedule: Buyer will make efforts to allow for Seller's standard lead-times, which is currently estimated to be ███████████████████████████████. Delivery in less than standard lead times shall only become binding on Seller if agreed in writing.  Seller recognizes however, that the nature of Buyer's business is such that circumstances do not always allow for Seller's desired lead-times.  In those instances when Buyer requests expedited service, Seller agrees to utilize reasonable commercial efforts to provide expedited service.  Should Buyer request expedited service which would require Seller to incur extra costs, Buyer shall be responsible for additional labor costs (Rush Fee) and premium freight charges for emergency shipments, only as quoted by Seller and mutually agreed in writing in advance.  Seller agrees to maintain an inventory at a US warehouse location equal to ███████████████ of the Firm Obligations to be delivered in the following month, which may be reduced upon mutual agreement.

   c. Buyer and Seller agree to work together to minimize inventory investments and balance workloads through the use of Electronic Data Interchange (EDI), material handling improvements, processing changes, and other available tools to improve overall efficiency.

Confidential

8. **TERMS AND ORDER OF DOCUMENTS**
   a. Terms:  Buyer shall purchase from Seller, and Seller shall sell to Buyer, the Battery Products, upon the purchase order terms and conditions set forth in this Agreement.

   b. Order of Documents:  Unless otherwise agreed to by authorized representatives of each party in writing, hereto, no other terms and conditions shall apply to the transactions contemplated hereunder including, but not limited to, any terms and conditions of either Party set forth in any quotation, order, order acknowledgment or other form submitted by either Party in connection with its sale of the Battery Products.  In the event of a conflict between the terms and conditions of this Agreement and those printed on any form provided by Buyer or Seller, those set forth herein shall govern and control.

9. **INVENTORY SUPPLY PROTECTION**

   Seller and Buyer agree to maintain the level of inventory set forth in Section 7.b.  Should Seller desire a temporary planned shutdown of manufacturing for any reason including, but not limited to, equipment maintenance, holiday shutdown, or production relocation, Seller agrees to notify Buyer, in writing, of such activity and to provide an inventory plan which is acceptable to Buyer to ensure that there will be no disruption in supply to Buyer.

10. **REPLACEMENT PARTS**

    Seller agrees to manufacture and sell replacement parts to Buyer for a period equal to ten (10) years beyond the end of the last contract year during which that particular Product was manufactured in ordinary commercial production.  Seller's obligations under this clause shall survive the expiration or any termination of this Agreement.  Buyer's purchases of replacement parts after the term of this Agreement shall be made on a purchase order issued to Seller and the price to be paid shall be mutually agreed by Seller and Buyer at the time the purchase order is accepted.  Seller's current replacement parts pricing is set forth on Exhibit D.  In the event that Buyer's orders of replacement parts cannot be economically supplied in the quantities ordered, Buyer and Seller shall, in good faith, determine an appropriate supply methodology which may include a "Final buy" of such low volume items.

11. **COMPETITIVE COMMITMENT**

    Buyer agrees that Seller's current Battery Products are competitive with alternatives as of the day of execution of this Agreement.  During the Term, Seller will make reasonable commercial efforts to remain competitive in terms of price, quality, and service. If Buyer believes Seller is not competitive in any area, the Buyer shall provide the Seller with written notice along with specific information defining the nature of any non-competitiveness.

Confidential

a. If the non-competitiveness is due to price for a similar purchase volume of a similar quality product, under similar delivery and financial terms, from a company able to provide similar backing of its Battery Products, then Buyer shall provide a copy of an alternate bona fide quote to Seller who shall have 30 days to match such alternate quote, Should Seller elect to not match the alternate bona fide offer, then Buyer may cancel any Purchase Orders, or parts thereof, for deliveries which are beyond the Firm Obligations window.

b. If the non-competitiveness is due to quality as evidenced by a similar product experiencing a materially lower initial failure rate or significantly higher mean time between failures, then Buyer shall supply such evidence to Seller and Seller will make reasonable commercial efforts to remedy its non-competitiveness within 30 days after receipt of such notice. If Seller fails to timely remedy its quality non-competitiveness, Buyer may cancel any Purchase Orders, or parts thereof, for deliveries which are beyond the Firm Obligations window.

c. If the non-competitiveness is due to a lack of or timely service, Buyer shall supply such evidence to Seller and Seller will make reasonable commercial efforts to promptly remedy its non-competitiveness within 30 days after receipt of such notice. If the Seller fails to timely remedy its non-competitiveness, Buyer may cancel any Purchase Orders, or parts thereof, for deliveries which are beyond the Firm Obligations window.

12. **PRODUCT MARKING**

Seller agrees to mark both the Battery Products and packaging materials in accordance with Buyer's reasonable instructions and to comply with all applicable customs' requirements of the importing Buyer's locations.

13. **TRACEABILITY**

Seller agrees to maintain records for all Battery Products as required to meet standard automotive traceability programs which shall include serial number traceability of all Battery Products, which shall include warranty information. Buyer agrees to provide the vehicle manufacturer, vehicle model, and VIN number for all serialized products purchased from Seller. Any additional detailed requirements for each Product must be mutually agreed upon by Buyer's and Seller's Quality Control personnel. The particular requirements for each Product family will be reduced to writing and signed by both parties. This information will be kept in a manner that permits quick retrieval and communication to Buyer in the event that it is required.

Confidential

14. **PUBLIC ANNOUNCEMENTS AND ADVERTISING**

    Neither party shall, without the prior written consent of the other, (a) make any news release, public announcement, denial or confirmation of all or any part of the subject matter of this Agreement, or any program hereunder; or (b) in any manner advertise or publish the fact that the parties have entered into this Agreement.

15. **TERMINATION; BREACH IN DELIVERY**

    a. This Agreement may be terminated immediately by either party at any time following written notice to the other, if the other party:

       (i) Commits any material breach (other than a payment breach) of the terms of this Agreement, and such breach is not cured within thirty (30) days after such breaching Party receives written notice of such breach; or

       (ii) Ceases to carry on business as a going concern, is unable to pay its debts as they fall due, any distress or execution is levied or threatened against it, has entered an unsatisfactory financial condition defined by one or more of the following (i) insolvency of Party; (ii) filing of a voluntary petition in bankruptcy by Party; (iii) filing of an involuntary petition in bankruptcy against Party that is not dismissed within sixty (60) days; (d) appointment of a receiver of trustee for Party; or (e) execution of an assignment for the benefit of creditors by Party, provided that such petition, appointment, or assignment is not vacated or nullified within thirty (30) days of such event.

    b. In addition, Buyer may terminate this Agreement and any purchase order or release issued pursuant hereto (or any part thereof) upon written notice of termination to Seller, if Buyer, acting in good faith, has reasonable grounds for insecurity about Seller's ability to continue to perform satisfactorily under this Agreement, including Seller's ability to maintain acceptable quality standards and delivery schedules.

    c. Seller may terminate for cause if Buyer fails to make payments for valid invoiced amounts on duly approved orders within ten (10) days of the due date of such payments. Further, Buyer understands that it will be charged 1.5% interest per month for any outstanding balance. Should Seller terminate for cause under this condition, Buyer shall be responsible to pay for all direct costs, including inventory, reasonable overhead and profit related to accepted orders for the Battery Products.

Confidential

d.  In addition, beginning in 2022, if within 120 days prior to the end of a calendar year the parties have not agreed on the Buyer's Minimum Capacity Commitment for the next calendar year, then either party shall have the right to terminate this Agreement by written notice to the other party. A termination under this subsection d. will be effective on December 31 of the calendar year in which the notice of termination is provided.

e.  The expiration or any termination of this Agreement shall not affect the parties' obligation to complete any Firm Obligations and any outstanding and unfilled purchase orders or releases issued and accepted pursuant to the terms of this Agreement prior to the date of such expiration or termination, and the rights and obligations of Buyer and Seller as stated in this Agreement shall continue with respect to such purchase orders or releases. The expiration or any termination of this Agreement will not prejudice or otherwise affect the rights and liabilities of the parties under applicable law or forgive any indebtedness then owing by either party or affect either party's obligations to maintain the confidentiality of proprietary or confidential information belonging to the other in accordance with the terms of the Confidentiality Agreement (as defined in Section 17).

f.  During any period in which Seller is in breach of its delivery obligations hereunder, Buyer may purchase such products from a third party, unless such breach in delivery is due to Buyer's late or non-payment.

g.  Buyer and Seller agree that the Battery Products purchased by Buyer from Seller under Purchase Order 1003672 (the "Initial Purchase Order") are to be used by Buyer confirm that the Battery Products meet the testing criteria set forth on Exhibit E attached hereto (the "Test Criteria"). Buyer shall have a period of four (4) weeks following its receipt of the Battery Products purchased under the Initial Purchase Order (the "Testing Period") to determine whether the Battery Products pass the Test Criteria. If Buyer, acting in good faith, concludes that the Battery Products do not pass the Test Criteria, then Buyer shall provide Seller with written notice ("Failure Notice") within ten (10) days following expiration of the Testing Period. The Failure Notice shall specifically identify the Test Criteria that were not satisfied and shall be accompanied with evidence supporting Buyer's conclusion including, without limitation, all test results and analysis. If Buyer and Seller are unable to resolve the reason for the failure within fifteen (15) days following Seller's receipt of the Failure Notice (the "Resolution Period"), then Buyer may at any time within ten (10) days following the expiration of the Resolution Period provide Seller with written notice ("Cancellation Notice") that Buyer is electing to (i) return the Battery Products for a full refund (and Seller shall pay all shipping and related costs) and (ii) terminate this Agreement in its entirety. If Buyer fails to timely provide a Failure Notice or Cancellation Notice, then Buyer shall be obligated to purchase the Battery Products under the Initial

Confidential

Purchase Order (and all other purchase orders already issued) and shall not have the right to cancel this Agreement.

**16.   FORCE MAJEURE**

Neither Seller nor Buyer shall be liable for damages for delay in, or prevention of, its performance under this Agreement arising out of causes beyond its reasonable control and without its fault, including, but not limited to, pandemics and epidemics and all federal, state and local orders and mandates issued in connection therewith, including, without limitation, COVID-19, acts of God or the public enemy, acts of any Government in either its sovereign or contractual capacity, fires, floods or freight embargoes. It shall be a condition of excuse under this Section that the party seeking excuse notifies the other party in writing within ten (10) days after the beginning of any cause that may excuse its performance under this Section. Notwithstanding anything herein to the contrary, however, Seller shall use commercially reasonable efforts to be able to resume its performance hereunder as soon as it is practicable for it to do so. During any period where Seller's performance hereunder is prevented due to force majeure, Buyer may purchase such products from a third party. If all, or any material portion, of Seller's performance under this Agreement is excused under this Section for a period exceeding sixty (60) days, then Buyer shall have the right to terminate this Agreement without further liability to Seller, provided that, Buyer shall remain liable for all Battery Products delivered prior to termination under this Section.

**17.   NON-DISCLOSURE AGREEMENT**

Seller and Workhorse Group Inc., an affiliate of Buyer, have entered into a Non-Disclosure Agreement dated September 28, 2020, all of the terms and conditions of which remain in full force and effect and are incorporated herein by reference. Buyer acknowledges and agrees that it is subject to the same duties, responsibilities and obligations under the Confidentiality Agreement as are appliable to Workhorse Group Inc.

**18.   PROHIBITION OF MANUFACTURE AND SALE**

Seller shall neither manufacture nor sell any Battery Products for which the design has been supplied by Buyer or its customer, in accordance with, or by using any of the drawings, designs, or other specifications, or any derivatives thereof, or by use of tooling furnished to it under this Agreement other than for the purpose of selling Battery Products to Buyer under this Agreement. Unless for lack of payment on prior delivered Battery Products, Battery Products manufactured under an accepted Purchase Order, including, but not limited to any Battery Products which Buyer does not accept due to defect, shall not be sold, transferred, or otherwise disposed of to any third party, except with the prior written consent of Buyer, which shall not be unreasonably withheld. This clause shall survive termination or expiration of this Agreement.

Confidential

19. **GRATUITIES; COMPLIANCE WITH ETHICAL REQUIREMENTS**

Each party warrants that neither it nor any of its employees, agents or representatives has offered or given any gratuities to employees, agents or representatives of the other with a view toward securing favorable treatment with respect thereto. Seller hereafter agrees that those employees, agents and contractors of Seller who are performing services for Buyer on Seller's behalf will be made aware of, and will comply with, the foregoing ethical requirements of Buyer which are set forth above. The Seller has not and, to the Seller's actual knowledge, none of its employees or agents at any time during the last five years have (i) made any unlawful contribution to any candidate for foreign office, or failed to disclose fully any contribution in violation of law, or (ii) made any payment to any federal or state governmental officer or official, or other person charged with similar public or quasi-public duties, other than payments required or permitted by the laws of the United States or any jurisdiction thereof.

20. **INSPECTION**

Buyer shall have the right to review any designs, drawings or specifications prepared by Seller and needed for installation and use of the Battery Products under this Agreement and to inspect and to witness the testing of Battery Products at Seller's premises prior to delivery to Buyer. For the avoidance of doubt, Seller shall not have to provide internal designs of Battery Products that are not needed for proper installation and use of the Battery Products. Buyer shall make such inspections in such a manner as to avoid any undue interference with Seller's work hereunder. Buyer shall also have the right to inspect Battery Products at Buyer's plant within 15 days after delivery. Any review, inspection or test by Buyer under this Section shall not relieve or excuse Seller from its obligations under this Agreement.

21. **QUALITY CONTROL**

Seller shall qualify as an acceptable vendor in compliance with the requirements of Buyer's Quality System Requirements within a reasonable time after Seller accepts Buyer's initial order for Battery Products. In addition to the Battery Products ordered under the Initial Purchase Order, Seller shall also provide such documentation reasonably requested by Buyer in connection with Buyer's Production Part Approval Process (PPAP) that are in Seller's possession or control. After its initial qualification, Seller shall maintain its status as an acceptable vendor under Buyer's Quality System Requirements. Seller agrees that its manufacturers will maintain ISO 9001 or IATF 16949 certification, as applicable.

22. **WARRANTY**

Seller offers both a 5-Year Standard and an 8-Year Extended Warranty on its Battery Products as described in Exhibit F, and Seller shall be jointly and severally liable with CATL for the performance of the warranty, provided the parties liability will be limited to the extent set forth

Confidential

in the Indemnification Agreement (as defined in Section 23). The pricing on Exhibit C is based on Seller's 8-year warranty. Seller warrants that it will deliver to Buyer good title to the Battery Products, free and clear of all liens and security interests. The warranty shall remain valid under approved uses by Buyer's customers and end users, however, it is Buyer's responsibility to process all warranty claims with Seller unless otherwise mutually agreed in writing.

For the sake of clarity, if a valid warranty claim is made, the warranty provided by Seller shall include reimbursing Buyer for its reasonable and necessary travel costs and expenses actually incurred by Buyer for the purpose of diagnosing the root cause of the product issue; provided, however, Buyer shall use its commercially reasonable efforts to utilize all resources available to it in order to minimize such travel related costs and expenses including, without limitation, the use of qualified third parties located near the disabled vehicle and remote/wireless diagnostic tools to perform the diagnostic testing services. Should the issue be mutually determined to be a warranty-covered battery failure, the remove and replace costs shall also be reimbursed to the Buyer.

### 23. PRODUCT LIABILITY; INDEMNIFICATION

Concurrent with the parties' execution of this Agreement, Buyer, Seller and CATL have executed the Indemnification Agreement attached as Exhibit G, all of the terms and conditions of which are incorporated herein by reference.

### 24. INTERNATIONAL DOCUMENTATION

Seller agrees to provide complete and accurate international shipping documents, including bills of lading, packing lists and invoices necessary to facilitate customs transactions, including certificates of origin, which meet the requirements of the laws of the U.S. and all other documentation as may be needed for shipment, delivery, and resale of goods covered by this Agreement, to retain copies of such documentation as may be required by law or Buyer, and to indemnify Buyer for all costs relative to Seller's failure to provide documentation on a timely basis, or costs arising from errors in such documentation.

### 25. EXPORT/IMPORT COMPLIANCE

Seller agrees to comply in all material aspects with all applicable export and import laws and regulations and any reasonable additional requirements of Buyer (which are made known to Seller) with respect to the import, export, re-export, or transfer of Battery Products. Seller shall obtain any necessary export or import authorizations to support deliveries under this Agreement. Upon request, Seller shall provide to Buyer the export control classification number (or dual use code), Harmonized Tariff Schedule ("HTS") numbers, and country of origin information for the Battery Products.

Seller shall support Buyer's efforts to participate in trade programs such as but not limited to the North America Free Trade Agreement ("NAFTA"), including producing certificates of

Confidential

origin and manufacturers' affidavits as required. Seller shall immediately notify Buyer in the event of any change to the export or import classification or country of origin information. Seller agrees to notify Buyer, in writing in advance, of any change in Seller's manufacturing location.

26. **HAZARDOUS MATERIAL**

Seller shall notify Buyer of every Product ordered hereunder which contains material hazardous or injurious to the health or physical safety of persons even though said hazard or injury may only occur due to mishandling or misuse of the Product. In addition, Seller shall identify the hazardous or injurious material and notify Buyer of the effects of such material on human beings and the physical manifestations that could result. For each Product so identified, Seller shall supply Buyer MSDS sheets, warning labels or instructional material appropriate to warn persons coming in contact therewith of the hazard and its effects.

27. **INTELLECTUAL PROPERTY**
    a. **Definitions:**
        i. **"Intellectual Property Rights"** means any patent, patented articles, patent applications, designs, industrial designs, copyrights, software, source code, database rights, moral rights, inventions whether or not capable of protection by patent or registration, techniques, know-how, technical data, trade secrets, and any other proprietary right, whether registered or unregistered, including applications and registrations thereof, all related and continuing rights, and all similar or equivalent forms of protection anywhere in the world, but specifically excludes all brands, trademarks, trade names, slogans or logos of Seller and Buyer unless specifically identified as a deliverable or work product of Seller pursuant to this Agreement.
        ii. **"Background Intellectual Property Rights"** means any Intellectual Property Rights of either Buyer or Seller relating to the Battery Products (i) existing prior to the effective date of this Agreement or prior to the date that Buyer and Seller began any technical discussions relating to the Battery Products, whichever is earlier, or (ii) that Buyer or Seller acquires, develops or creates after these dates but outside the scope of this Agreement.
        iii. **"Foreground Intellectual Property Rights"** means any Intellectual Property Rights, except Background Intellectual Property Rights, (i) that are acquired, developed or created in whole or in part by Buyer alone, by Buyer and Seller jointly, or by Seller alone, in connection with this Agreement, or (ii) relating to the Battery Products.
    b. **Ownership and License of Background Intellectual Property Rights** – Buyer and Seller shall each retain full and complete ownership of their Background Intellectual Property Rights and neither Buyer or Seller is transferring or granting any license in and to its Background Intellectual Property rights to the other Party, unless expressly identified otherwise herein.
    c. **Ownership and License of Foreground Intellectual Property Rights** – Except for the sole exception in paragraph d below, Buyer and Seller will each retain ownership of any Foreground Intellectual Property Rights that are solely developed, created or made by their

Confidential

respective employees, agents or subcontractors ("Representatives"). Buyer and Seller will jointly own any Foreground Intellectual Property Rights that are jointly developed, created or made by Buyer and Seller.

d.  All Intellectual Property Rights associated with or incorporated in the Battery Products which are created, developed, or first conceived or reduced to practice by or on behalf of the Seller, including without limitation by any person or entity employed or working under the direction of Seller, and for which Buyer has agreed to reimburse (whether by lump sum payment or as a portion of the piece price or otherwise) or has actually reimbursed Seller, and which Buyer and Seller have agreed in writing that Buyer will fund the development with the specific intent to include the Intellectual Property Rights to the development, are and shall be the sole and exclusive property of Buyer.

In such case, Seller hereby agrees that it shall cause its employees to sign any papers necessary to enable Buyer to file applications for patents or to otherwise secure and record rights in such intellectual property throughout the world. To the extent that such Intellectual Property Rights includes any works of authorship (including, computer programs and works described under 17 USC § 102) such works shall be considered "works made for hire", and to the extent that such works do not qualify as "works made for hire", Seller agrees to and hereby does assign to Buyer all rights, title, and interest in and to all copyrights and moral rights therein.

28.  **EFFECT OF INVALIDITY**

The invalidity in whole or in part of any provision hereof shall not affect the validity of any other provision.

29.  **COUNTERPARTS**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one instrument.

30.  **NOTICES**

All notices, claims, certificates, requests, demands and other communications hereunder will be in writing and will be deemed to have been duly given if delivered or mailed (by overnight express, registered or certified mail as follows:

    If to Buyer:    Workhorse Technologies Inc.
                             100 Commerce Drive
                             Loveland, Ohio 45140
                             Attention:    Chief Executive Officer

    If to Seller:    Coulomb Solutions, Inc.
                             235 Wright Brothers Ave

Confidential

Livermore, California, USA 94551
Attention: <u>Chief Executive Officer</u>

**31. CONTRACT INTERPRETATION**

The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**32. GOVERNING LAW**

This Agreement shall be governed by and interpreted in accordance with, the substantive laws of the State of Michigan, including the provisions of the Uniform Commercial Code.

**33. JURISDICTION AND VENUE.**

If a dispute is not resolved, or a plan mutually agreed in writing, within 30 days, it may be submitted by mutual agreement to a mediation. Exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement that are not resolved by mutual agreement shall be in, and for such purpose each party hereby irrevocably submits to the jurisdiction of, the Federal and state courts located in the City of Detroit, State of Michigan.

**34. ENTIRE AGREEMENT; AMENDMENT**

This Agreement, the Exhibits and the Indemnification Agreement supersedes any and all prior and contemporaneous communications, negotiations or documents regarding the subject matter hereof and thereof and is the complete expression of the Agreement between Seller and Buyer with respect hereto and thereto. This Agreement may be modified or amended at any time, but only as agreed in writing by authorized representatives of each of the parties.

**(Signatures Next Page)**

Confidential

**IN WITNESS WHEREOF,** the parties have caused their duly authorized representatives to sign this Agreement the day and year first written above.

**WORKHORSE TECHNOLOGIES INC.**  **COULOMB SOLUTIONS, INC.**

By: *Steve Schrader*  By: *David M. Mazaika*

Name: Steve Schrader  Name: David Mazaika

Title: CFO  Title: CEO

Date: 5/3/2021  Date: 5/3/21

**EXHIBITS OMITTED**