## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

COULOMB SOLUTIONS INC.,

     Plaintiff,

vs.

WORKHORSE TECHNOLOGIES INC.,

     Defendant.

Case No. 2:24-cv-11048

Hon. Nancy G. Edmunds

Magistrate Judge Curtis Ivy, Jr.

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In this commercial collection case, plaintiff Coulomb Solutions, Inc. ("Coulomb") respectfully moves this Court for summary judgment on its claim for breach of contract because there exists no genuine issue of material fact that Workhorse Technologies, Inc. ("Workhorse"), a manufacturer of electric delivery vans, accepted the goods delivered by Coulomb (battery systems), the goods conformed to Workhorse's orders in all respects, and Workhorse failed to pay the contract price. In support of its motion, Coulomb relies upon the facts, authority, and arguments set forth in the accompanying brief and attached exhibits.

Pursuant to Local Rule 7.1(a), Coulomb contacted counsel for Workhorse on November 27, 2024, in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought.

Respectfully submitted,

Dated: November 27, 2024          **KERR, RUSSELL AND WEBER, PLC**

By: */s/ James E. DeLine*
     James E. DeLine (P45205)
     Matthew L. Powell (P69186)
500 Woodward Avenue, Suite 2500
Detroit, MI  48226
(313) 961-0200
jdeline@kerr-russell.com
mpowell@kerr-russell.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

COULOMB SOLUTIONS INC.,

     Plaintiff,

vs.

WORKHORSE TECHNOLOGIES INC.,

     Defendant.

Case No. 2:24-cv-11048

Hon. Nancy G. Edmunds

Magistrate Judge Curtis Ivy, Jr.

---

# BRIEF IN SUPPORT OF PLAINTIFF'S
# <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Statement of Issues Presented..................................................................... iii

Controlling or Most Appropriate Authority ..................................................iv

I.      Introduction........................................................................................1

II.     Statement of Material Facts..............................................................1

      A.     Background. .........................................................................1

      B.     The 2021 Supply Agreement................................................3

            1.     The Undisputed Amount Owed.**Error! Bookmark not defined.**

            2.     Other Relevant Portions of the Agreement.**Error! Bookmark not defined.**

      C.     The 2023 Blanket Purchase Order and Releases. .................7

III.    Standard of Review...........................................Error! Bookmark not defined.

IV.     Argument..........................................................Error! Bookmark not defined.

      A.     There is No Genuine Issue of Material Fact that Workhorse Breached the 2021 Supply Agreement.............................................................11

      B.     There is No Genuine Issue of Material Fact that Coulomb is Entitled to Summary Judgment on the 2023 Invoices. ..........................................12

      C.     Coulomb Is Entitled to Pre-Judgment Interest at the Contractual Rate. ....................................................................................................14

V.      Conclusion and Relief Sought.........................................................17

## STATEMENT OF ISSUES PRESENTED

Should the Court grant plaintiff summary judgement on its breach of contract claim for the sale of goods where there exits no genuine issue of material fact that defendant accepted the goods delivered, the goods conformed to the order, and defendant failed to pay the contract price?

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................9

*Banish v. City of Hamtramck*, 9 Mich. App. 381, 385, 157 N.W.2d 445 (1968)....14

*Carpenter v. Smith*, 147 Mich. App. 560; 383 N.W.2d 248 (Mich. Ct. App. 1985)
..................................................................................................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................8

*Colson v. City of Alcoa, Tennessee*, 2021 WL 3913040 (6th Cir. 2021) .................9

*Currie v. Fiting*, 375 Mich. 440, 454, 134 N.W.2d 611 (1965) ..............................15

*Holland v. Earl G. Graves Publishing Co*., 33 F. Supp.2d 581, 583 (E.D. Mich.
1998) ..........................................................................................................14

*Independence Twp. v. Reliance Bldg. Co.*, 175 Mich. App. 48; 437 N.W.2d 22
(Mich. Ct. App. 1989) ..................................................................................10

*Jones v. Jackson Nat'l Life Ins. Co*., 819 F. Supp. 1382, 1383 (W.D. Mich. 1993)14

*Mich. Chandelier Co. v. Morse*, 297 Mich. 41; 297 N.W. 64, 67 (Mich. 1941).....10

*Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161; 848 N.W.2d 95, 104
(Mich. 2014) ..................................................................................................9

*MSSC, Inc. v. Airboss Flexible Prod. Co.*, 511 Mich. 176; 999 N.W.2d 335 (2023),
as amended (Sept. 22, 2023)........................................................................12

*Robinson v. Loyola Foundation, Inc*., 236 So.2d 154, 157 (Fla. App. 1970) .........15

*Roseborough v. Empire of America*, 168 Mich. App. 92; 423 N.W.2d 578 (Mich.
Ct. App. 1987) ..............................................................................................10

*RSM Richter, Inc. v. Behr America, Inc.*, 781 F.Supp.2d 511, 517 (E.D. Mich.
2011) ............................................................................................................13

*V & M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012).......................9

*Woody v. Tamer*, 158 Mich. App. 764; 405 N.W.2d 213 (Mich. Ct. App. 1987)...10

**Rules**

440.2105......................................................................................................11

Fed. R. Civ. P. 56 ........................................................................................8

MCL 438.7 ..................................................................................................15

Mich. Comp. Laws § 2.709(a)(1)...............................................................12

Mich. Comp. Laws § 440.2102...................................................................11

Mich. Comp. Laws § 440.2301...................................................................12

Mich. Comp. Laws § 440.2606...................................................................13

## I.     INTRODUCTION

In this diversity action, Coulomb Solutions, Inc. ("Coulomb") seeks payment from Workhorse Technologies, Inc. ("Workhorse"), a publicly-traded start-up manufacturer of electric "last mile" delivery vans, for battery packs and related goods supplied by Coulomb and accepted by Workhorse.  Workhorse says it failed to pay because its projected sales never materialized and it ran out of money. Workhorse's SEC disclosures, however, suggest that has sufficient cash reserves to pay.  Because there exists no genuine issue of material fact that Workhorse failed to pay the contract price for goods accepted, Coulomb is entitled to summary judgment on its breach of contract claim.

## II.     STATEMENT OF MATERIAL FACTS

The following facts are based primarily on admissions by Workhorse in deposition testimony given by its vice president of purchasing and supply chain (James Peters), chief financial officer (Robert Ginnan), and chief executive officer (Richard Dauch) and on documents prepared or signed by Workhorse.

### A.     **The Parties**

Coulomb is the leading North American supplier of electrification solutions for the commercial truck and bus industry.  ECF No. 11-1, Declaration of Brad Timon ¶ 3 ("Timon Dec.").  Coulomb is also the authorized North American distributor of commercial lithium-ion batteries for CATL, the largest lithium-ion battery manufacturer in the world. *Id*.

Workhorse is a publicly-traded manufacturer of electric last-mile delivery vans. Transcript of the deposition of James Peters ("Peters Tr.") at 20:8-12, **Exhibit 1**. Workhorse uses lithium-ion batteries to power its delivery vans. Peters Tr. at 21:14. Workhorse's largest customer is Federal Express, to whom it has sold a grand total of fifteen delivery vans. *Id.* Peters Tr. at 21:16-19.

In its June 30, 2024, Form 10-Q quarterly report filed with the United States Securities and Exchange Commission, Workhorse reported that it had sales of $2.2 million, incurred a net loss of $55.5 million and used $30.1 million of cash in operating activities during the six months ended June 30, 2024. *See* Workhorse 10-Q Report dated 6/30/24 ("10-Q") at p. 14, **Exhibit 2**. Workhorse further reported that, as of June 30, 2024, it had $5.3 million of cash and cash equivalents, accounts payable of $10.5 million, working capital of $17.8 million, and an accumulated deficit of $807 million. *Id.*

Given its declining financial stability, Workhorse reported to the SEC that "[a]s a result of our recurring losses from operations, accumulated deficit, projected capital needs, and delays in bringing our vehicles to market and lower than expected market demand, ***substantial doubt exists regarding our ability to continue as a going concern***…." 10-Q at p. 14. Workhorse also disclosed to the SEC that Coulomb had commenced this collection action seeking damages "in excess of $4 million, including alleged past due amounts, interest, and collection costs" and that

Workhorse "has accrued for these appropriate amounts as of June 30, 2024." *Id.* at p. 32. As a result of its poor sales, Workhorse is having difficulty paying its suppliers. Peters Tr. at 25:12-17.

B.      **The Supply Contracts**

Workhorse selected Coulomb to supply the batteries for its vans because Coulomb had a "solid" reputation and had enough batteries to support Workhorse's "very aggressive" launch schedule.  Peters Tr. at 27:21-25. Workhorse and Coulomb entered into two separate supply contracts.  The first supply contract was a 2021 written supply agreement signed by the parties.  The second contract was a release-by-release contract based on two 2023 blanket purchase orders issued by Workhorse and accepted by Coulomb.

1.      **The 2021 Supply Agreement**

Coulomb and Workhorse entered into a written Supply Agreement dated April 30, 2021, (the "2021 Agreement") governing Workhorse's purchase of battery products from Coulomb for the Workhorse model C-1000 van. *See* 2021 Agreement at ¶2, **Exhibit 3**;  ECF No. 15-1, Declaration of James C. Peters ¶ 3 ("Peters Dec."); Peters Tr. at 40:18.  The 2021 Agreement included a discounted price per kilowatt hour with a minimum annual purchase commitment and a mathematical formula to compute a "Shortfall" amount due Coulomb if Workhorse failed to meet the minimum annual purchase commitment:

1.  Purchase and Sale of Battery Products

Buyer desires to receive the pricing on the Battery Products as set forth on Exhibit C (the "Pricing Schedule") during the Term (as defined in Section 4) of this Agreement and ***in order to receive such pricing***, Buyer agrees as follows:

Minimum Capacity Commitment – Buyer agrees to purchase from Seller and Seller agrees to sell to Buyer, an agreed upon combined minimum kWh capacity (the agreed upon minimum kWh capacity is referred to in this Agreement as the "Minimum Capacity Commitment") of those battery products set forth on Exhibit A (the "Battery Products"), or any future Battery Products offered by Seller and desired by Buyer. During the year 2021), ***Buyer's Minimum Capacity Commitment shall be 176,500 kWh***. Buyer's Minimum Capacity Commitment for any successive calendar year shall be agreed upon by the parties 120 days prior to the end of each calendar year. ***Buyer agrees that if Buyer fails to purchase the full Minimum Capacity Commitment for the applicable year for any reason other Buyer's early termination of this Agreement pursuant to Section 15, then Buyer shall pay to Seller an amount equal to the sum of*** (X) ***the difference between*** (1) ***the aggregate purchase price paid by Buyer to Seller during the applicable calendar year and*** (2) ***what the aggregate purchase price would have based on the price (per the Pricing Schedule) that corresponds to the actual kWh capacity purchased by Buyer during such calendar year*** (this difference between (1) and (2) being the "***Shortfall***"), ***plus*** (Y) ***a carrying cost and administration fee equal to 10% of the Shortfall***. For this purpose, unfilled Firm Obligations (as specified in Section 7a) as of the end of the applicable calendar year shall be treated as a purchase in such calendar year.

Ex. 2 at ¶1 (emphasis added). Workhorse describes the Minium Capacity Commitment as a "take-or-pay" provision. Peters Tr. at 39:19.

The 2021 Agreement provides that Workhorse will be charged 1.5% interest per month, or 18% per annum, for any outstanding balance. Ex. 2 at ¶ 15.c. The 2021 Agreement further provides that it shall be governed by and interpreted in

accordance with the substantive laws of the State of Michigan, including the provisions of the Uniform Commercial Code. *Id*. ¶ 32.  Workhorse also agreed to pay "all costs associated with collection, including reasonable attorney's fees," if Workhorse breached its payment obligations under the 2021 Agreement. *Id*. at ¶ 3.

**a.     Workhorse concedes that it owes a Shortfall under the 2021 Agreement for failing to satisfy the <u>Minimum Capacity Commitment in 2021.</u>**

Through a purchase order dated January 8, 2021, attached hereto as **Exhibit 4**, Workhorse ordered 300 battery systems under the 2021 Agreement.  Peters Tr. at 53:19-54:4. Through a separate purchase order dated May 10, 2021, attached hereto as **Exhibit 5**, Workhorse ordered another 300 battery systems under the 2021 Agreement, bringing the total quantity of battery systems ordered in 2021 to ***700***.  Peters Tr. at 55:23-56:17, 58:24-59:1.  But the Minimum Capacity Commitment for 2021 (176,500 kWh) equates to at least ***1,500*** battery systems per the pricing schedule attached as exhibit C to the 2021 Agreement.

**EXHIBIT C**

**BATTERY PRODUCT PRICING**

| Item No | Item | kWh Purchased | QTY Veh/Yr | Price/kWh | Price/kWh | Price/kWh | Price/kWh |
|---|---|---|---|---|---|---|---|
| Year | | | | 2021 | 2022 | 2023 | 2024 |
| 1 | CATL LFP Packs Any Combination meeting total kWh The QTY Veh/Yr assumes 4G packs of 30.08kWh each for a total of 120.32kWh/vehicle | 1-3,499 | 1-30 | $401.41 | $382.41 | $364.36 | $350.64 |
| 2 | | 3,500-10,499 | 31-88 | $362.46 | $345.41 | $329.21 | $316.90 |
| 3 | | 10,500-17,499 | 89-149 | $327.31 | $312.02 | $297.48 | $286.44 |
| 4 | | 17,500-35,499 | 150-299 | $296.91 | $283.14 | $270.05 | $260.10 |
| 5 | | 35,500-176,499 | 300-1499 | $267.46 | $255.16 | $243.47 | $234.59 |
| 6 | | 176,500-1,060,000 | 1500-8899 | $252.26 | $240.72 | $229.75 | $221.42 |
| 7 | | 1,060,000-1,499,999 | 8900-12,499 | $238.01 | $227.18 | $216.89 | $209.07 |
| 8 | | 1,500,000+ | 12,500+ | $226.61 | $216.35 | $206.60 | $199.20 |

Workhorse produced less than twenty C-1000 vans due to multiple quality issues with the vehicle unrelated to the batteries.  Peters Tr. at 40:21-24, 41:1-7.  As a result, Workhorse admitted that it failed to purchase the Minimum Capacity Commitment in 2021:

> Q.    So would you agree in 2021 Workhorse failed to purchase the unit capacity commitment under the 2021 supply agreement?
>
> A.    Yes.

Peters Tr. at 59:19-22.  Workhorse also admits that it never terminated the 2021 Agreement early.  Peters Tr. at 51:20.  Workhorse therefore admits that it owed Coulomb for a shortfall under the 2021 Agreement:

> Q.    So Workhorse believed in early 2022 that there was a shortfall that it owed under the 2021 supply agreement?
>
> A.    Workhorse did.

Peters Tr. at 63:1-4.

### b.    Workhorse does not dispute the amount of the Shortfall due under the 2021 Agreement

Coulomb notified Workhorse of the Shortfall due under the 2021 Agreement in the amount of $1,435,860.  Peters Tr. at 62:12-14, 65:23-25, 66:6-10; Email dated 1/17/22, **Exhibit 6**.  Workhorse does not dispute Coulomb's computation of the Shortfall amount:

> Q.    So as of today, under the 2021 supply agreement Workhorse owes CSI $1,435,860.58?
>
> A.    Yes.

Peters Tr. at 69:7-10.  *See also* Peters Tr. at 62:12-20 (confirming that Coulomb's computation of the shortfall amount was accurate); Peters Tr. at 68:2-5 (agreeing that the shortfall amount equals $1.39 million plus the ten percent carrying cost).

On July 15, 2022, Coulomb invoiced Workhorse in the amount of $1,435,860 for the Shortfall.  *See* Shortfall Invoice, **Exhibit 7**.  Workhorse did not dispute the invoice.  Peters Tr. at 69:4-6.  Workhorse, however, contends that it paid $400,000 towards the Shortfall invoice. Peters Tr. at 69:12-18.  For purposes of this motion and to avoid any disputed issue of material fact, Coulomb will give Workhorse full credit for the $400,000 that Workhorse claims it paid towards the $1,435,860 Shortfall amount, leaving a balance due of $1,035,860.

Workhorse nevertheless failed to pay the Shortfall balance. Peters Tr. at 69:12-20; **Exhibit 8**, Deposition Transcript of Robert Ginnan (CFO) ("Ginnan Tr.) at 73; **Exhibit 9**, Deposition Transcript of Richard Dauch (CEO) ("Dauch Tr.") at 49. Workhorse claims it failed to pay simply because it lacked the funds and because Coulomb sued Workhorse for collection. Ginnan Tr. at 35; Dauch Tr. at 36.

## 2.    The 2023 release-by-release contracts.

On June 1, 2023, Workhorse issued two blanket purchase orders to Coulomb for battery systems for the new Workhorse model W56 van. Peters Tr. at 73:25-75:10, 78:17-20.  *See also* **Exhibit 10**, Skorupski 8/30/23 email transmitting blanket purchase orders. The blanket purchase orders specify the particular parts to be

ordered and the price per part. Peters Tr. at 77:3-5; blanket purchase orders, Ex. 10. The quantity of goods ordered is specified in subsequent releases issued by Workhorse.  Peters Tr. at 75:18-24, 78:5-7.  The blanket purchase orders also specify payment terms of "50PP/N 30," which means 50% is due upon order, and the remaining 50% is due 30 days after receipt of invoice.  Peters Tr. at 77:8-18; Ex. 10.

On November 28, 2023, Workhorse issued releases to Coulomb for 100 battery systems. Peters Tr. at 82:20-23, 84:17-19. *See also* **Exhibit 13**, Releases. Pursuant to the payment terms in the blanket purchase order, Workhorse prepaid 50% of the purchase price upon issuance of the release.  Peters Tr. at 80:9-19. Coulomb delivered all 100 of the battery systems in conforming condition, and Workhorse accepted delivery without objection, rejection, or revocation.  Peters Tr. at 84:24-85:12; Ginnan Tr. at 25-26; Dauch Tr. at 33-36.

On January 2, 2024, Workhorse issued a separate release to Coulomb for 100 battery chargers. Peters Tr. at 92:22-93:1.  *See also* **Exhibit 13**, Releases. Coulomb delivered all 100 of the battery chargers in conforming condition, and Workhorse accepted delivery without objection, rejection, or revocation.  Peters Tr. at 92:2-13.

Coulomb issued the following series of invoices (collectively, the "Delinquent Invoices") to Workhorse for the aforementioned battery systems and chargers delivered and accepted:

- Invoice Number 3547 in the amount of $608.74. **Exhibit 14**. Workhorse accepted delivery of these goods but failed to pay the invoice when due.  Peters Tr. at 95:12-24; Timon Dec. ¶ 16.

- Invoice Number 3631 in the amount of $3,654. **Exhibit 15.** Workhorse accepted delivery of these goods but failed to pay the invoice when due. Peters Tr. at 96:8-18; Timon Dec. ¶ 17.

- Invoice Number 3633 in the amount of $448.72, for Goods delivered to and accepted by Workhorse. **Exhibit 16**. Workhorse accepted delivery of these goods but failed to pay the invoice when due.  Peters Tr. at 97:2-18; Timon Dec. ¶ 18.

- Invoice Number 3674 in the amount of $464,900. **Exhibit 17**. Workhorse accepted delivery of these goods but failed to pay the invoice when due.  Peters Tr. at 93:12-22; Timon Dec. ¶ 19.

- Invoice Number 3682 in the amount of $2,482,019.50.  **Exhibit 18**. Workhorse accepted delivery of these goods but failed to pay the invoice when due.  Peters Tr. at 86:23-87:13; 90:8-17; Timon Dec. ¶ 17, 20.

- Invoice Number 3745 in the amount of $659.58. **Exhibit 19**. Workhorse accepted delivery of these goods but failed to pay the invoice when due.  Peters Tr. at 97:24-98-8; Timon Dec. ¶ 21.

- Invoice Number 3751 in the amount of $329.79. **Exhibit 20**. Workhorse accepted delivery of these goods but failed to pay the invoice when due.  Peters Tr. at 98:17-99:3; Timon Dec. ¶ 22.

The Delinquent Invoices total **_$2,952,620.33_**.

Workhorse has not provided notice to Coulomb of any dispute as to the Delinquent Invoices. Timon Decl. ¶ 23; Peters Tr. at 84-85, 94-98; Ginnan Tr. at 25-26; Dauch Tr. at 33-36. To the contrary, Workhorse acknowledges that Coulomb is its largest creditor.  Peters Tr. at 33:12.  Despite receiving multiple rounds of cash infusions from its secured lender and paying other suppliers, Workhorse has

deliberately failed to pay the Delinquent Invoices. Ginnan Tr. at 72-73; Dauch Tr. at 49. On April 16, 2024, following earlier attempts to obtain payment from Workhorse, Coulomb sent Workhorse written notice of breach and demand for payment. *See* Timon Dec. ¶ 29. Despite Coulomb's notice and demand, Workhorse still failed to pay. Timon Dec. ¶ 30.

## III.   ARGUMENT

Where the nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the lack of evidence supporting the nonmovant's claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). The party bringing the summary judgment motion bears the initial burden of demonstrating the absence of a genuine issue of material fact through pleadings, depositions, answers to interrogatories, admissions in the record, affidavits, and any other form of evidence that would be admissible at trial. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322-23 (1986).

Once the initial burden is met, the opposing party must then come forward with evidence showing that there is, indeed, an genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute is genuine only when there exists enough evidence for the nonmoving party to win at trial. *Anderson*, 477 U.S. at 249-50; *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th

Cir. 2012). A summary judgment motion must be granted if a preponderance of the evidence favors the moving party. *Anderson*, 477 U.S. at 252.

### A. Workhorse breached the 2021 supply agreement by failing to pay the Shortfall.

A party asserting a breach of contract must establish by a preponderance of the evidence that: (1) there was a contract; (2) which the other party breached; and (3) the damages the party claiming breach were caused by the breaching party. *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178; 848 N.W.2d 95, 104 (2014). A party breaches a contract by either refusing to perform, *Carpenter v. Smith*, 147 Mich. App. 560, 564–565; 383 N.W.2d 248 (1985), or through performance that does not conform to the contract's requirements. *Woody v. Tamer*, 158 Mich. App. 764, 772; 405 N.W.2d 213 (1987).

The primary goal in the interpretation of a contract is to determine the intent of the parties. *Quality Products & Concepts Co v Nagel Precision, Inc.*, 469 Mich 362, 375 (2003). The intent of contracting parties is ascertained and enforced according to the plain language of the contract. *Wausau Underwriters Ins Co v Ajax Paving Indus*, 256 Mich App 646, 650 (2003).  When the language of a contract is unambiguous, it is construed and enforced as written. *Quality Products, 469 Mich at 375*.

The existence and validity of the 2021 Agreement are not in dispute. The 2021 Agreement is unambiguous and must be enforced as written.  There exists no

dispute, based on Workhorse's own admissions, that it failed to satisfy the Minium Capacity Commitment in the 2021 Agreement by ordering only 700 battery systems in 2021. The also exists no dispute, based on Workhorse's own admissions, as to the amount of the Shortfall due Coulomb or that Workhorse failed to pay the Shortfall in full. Giving Workhorse full credit for the $400,000 that it claims it paid toward the $1,435,860 Shortfall, Coulomb is owed $1,035,860 for the Shortfall under the 2021 Agreement. Because there exists no genuine issue of material fact as to the existence or amount of the Shortfall due under the 2021 Agreement, Coulomb is entitled to summary judgment.

**B.  Workhorse breached the 2023 release-by-release contracts by failing to pay the Delinquent Invoices.**

The Michigan Uniform Commercial Code applies to "transactions in goods." Mich. Comp. Laws § 440.2102. Workhorse's 2023 orders were transactions in goods between merchants. *See id.* § 440.2105 ("'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action.").

In 2023, the Michigan Supreme Court recognized the existence, validity, and enforceability of commonly-used "release-by-release" contracts based on blanket purchase orders:

12

> [S]imilar to requirements contracts, some agreements are governed by a blanket purchase order that sets the overall contract terms, and the buyer issues subsequent releases that set forth the specific quantity the buyer needs. But unlike a requirements contract, the blanket purchase order does not set forth the share of the buyer's need to be purchased from the supplier. …. Instead, the purchase order is more appropriately thought of as an umbrella agreement that governs the terms of future contract offers. *See David Engineering Co.*, unpub. op. at 2. Although the seller is not bound to accept future orders in the same manner as with a requirements contract, the seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted. *See Opdyke Investment Co v Norris Grain Co*, 413 Mich. 354, 359, 320 N.W.2d 836 (1982) ("A contract to make a subsequent contract is not per se unenforceable; in fact, it may be just as valid as any other contract."). These agreements are also known as "release-by-release" contracts.

*MSSC, Inc. v. Airboss Flexible Prod. Co.*, 511 Mich. 176, 183–84, 999 N.W.2d 335, 340 (2023), as amended (Sept. 22, 2023).

Under the UCC, a buyer of goods is generally obligated to "accept and pay in accordance with the contract." Mich. Comp. Laws § 440.2301. Acceptance occurs when, after a reasonable time, the buyer "fails to make an effective rejection." *Id.* § 440.2606. When a buyer fails to pay the price as it becomes due, the seller may recover the price of the goods accepted. Mich. Comp. Laws § 2.709(a)(1).

Here, the undisputed evidence establishes that the parties entered into a release-by-release contract for the sale of goods. The price and payment terms were set forth in the blanket purchase orders; the quantities were set forth in the releases. The undisputed evidence establishes that Coulomb delivered the goods in the quantities released and in conforming condition, and Workhorse accepted all

deliveries without objection, rejection, or revocation. As a matter of black letter UCC law, Workhorse is obligated to pay the contract price for all goods accepted. Mich. Comp. Laws §§ 440.2301, 440.2709.

The undisputed evidence further establishes that Coulomb breached the release-by-release agreement by failing to pay the Delinquent Invoices totaling $2,952,620.33. Apparently Workhorse intentionally elected not to use any of its $5.3 million in cash and cash equivalents or $17.8 million of working capital to pay Coulomb. Coulomb is therefore entitled to entitled to summary judgment in the total principal amount of $2,952,620.33 for Workhorse's breach of the release-by-release agreement. Summary judgment is imperative due to Workhorse's perilous financial condition.

## C. Coulomb Is Entitled to Pre-Judgment Interest at the Contractual Rate.

As this Court observed in *RSM Richter, Inc. v. Behr America, Inc.*, 781 F.Supp.2d 511, 517 (E.D. Mich. 2011), "[w]ith respect to interest potentially accruing before the filing of the complaint, federal courts applying Michigan law have recognized that generally Michigan courts have included interest as an element of damages as a matter of right where the amount of the claim is liquidated." *Id.* at 519 (internal quotations and citations omitted). A claim for damages is liquidated where the amount "is fixed, has been agreed upon, or is capable of ascertainment by mathematical computation or operation of law. . . . In cases where the amount

claimed is liquidated, interest has generally been allowed from the date when the claim accrued or in other words, from the date compensation would have been due had it been paid voluntarily." *Id.* (internal quotations and citations omitted).

Here, Coulomb's damages caused by Workhorse's nonpayment of the Delinquent Invoices are liquidated, and therefore, Coulomb is entitled to interest from each date on which those invoices came due. The amount of interest that has accrued on account of the Delinquent Invoices as of May 29, 2024, is $158,556.04, and interest continues to accrue at a per diem rate of $1,456.09 thereafter. Timon Decl. ¶31. Accordingly, as of November 27, 2024, the amount of interest that has accrued is $423,564.50.

Coulomb is entitled to default interest at the rate stipulated to in the 2021 Agreement, 18% per annum, under Michigan law. Michigan Compiled Laws §438.7 governs the award of prejudgment interest and provides, in pertinent part, as follows:

> [i]n all actions founded on contracts express or implied, whenever in the execution thereof any amount in money shall be liquidated or ascertained in favor of either party, by verdict, report of referees, award of arbitrators, or by assessment made by the clerk of the court, or by any other mode of assessment according to law, it shall be lawful...to allow and receive interest upon such amount so ascertained or liquidated, until payment thereof or until judgment shall be thereupon rendered; and in making up and recording such judgment, the interest on such amount shall be added thereto, and included in the judgment.

"With respect to interest potentially accruing before the filing of the complaint, federal courts applying Michigan law have recognized that 'generally

Michigan courts have included interest as an element of damages as a matter of right where the amount of the claim is liquidated.' " *Holland v. Earl G. Graves Publishing Co.*, 33 F. Supp.2d 581, 583 (E.D. Mich. 1998), quoting *Jones v. Jackson Nat'l Life Ins. Co.*, 819 F. Supp. 1382, 1383 (W.D. Mich. 1993) (citing *Banish v. City of Hamtramck*, 9 Mich. App. 381, 385, 157 N.W.2d 445 (1968)). A claim for damages is "liquidated" when " 'the amount thereof is fixed, has been agreed upon, or is capable of ascertainment by mathematical computation or operation of law.' " *Holland, supra* (quoting *Robinson v. Loyola Foundation, Inc.*, 236 So.2d 154, 157 (Fla. App. 1970)) (internal citations omitted). In cases where the amount claimed is liquidated, "interest has generally been allowed from the date when the claim accrued or in other words, 'from the date compensation would have been due had it been paid voluntarily.' " *Jones*, 819 F. Supp. at 1383 (quoting *Currie v. Fiting*, 375 Mich. 440, 454, 134 N.W.2d 611 (1965)). Accordingly, Coulomb is entitled to include within its damages all interest that has accrued since default of each of the Delinquent Invoices at the contractual rate of 18% per annum.

### D.     Coulomb Is Entitled to Contractual Attorney Fees.

If the Court grants summary judgment in favor of Coulomb, Workhorse is obligated under the 2021 Agreement to pay "all costs associated with collection, including reasonable attorney's fees." Ex. 3 at ¶ 3.  Coulomb is therefore entitled to

an award of all costs associated with collection, including reasonable attorney's fees, to be determined by the Court at a later date.

## IV.   <u>CONCLUSION AND RELIEF SOUGHT</u>

For all the foregoing reasons, Coulomb Solutions, Inc. respectfully requests that the Court grant its motion for summary judgment and enter an order:

A.   Awarding Coulomb a money judgment against Workhorse in the principal amount of *$1,035,860* for breach of the 2021 Agreement and in the principal amount of *$2,952,620.33* for breach of the 2023 release-by-release contracts;

C.   Awarding Coulomb a money judgment against Workhorse in an amount of *$423,564* for accrued interest as of November 27, 2024, which continues to accrue at a per diem rate of $1,456.09 thereafter;

D.   Awarding Coulomb a money judgment against Workhorse for all interest that has accrued since default of each of the Delinquent Invoices at the contractual rate of 18% per annum;

E.   Awarding Coulomb all costs associated with collection of the judgment, including reasonable attorney's fees, to be determined by the Court at a later date; and

F.   Awarding Coulomb such other relief that is equitable and just.

Respectfully submitted,

Dated: November 27, 2024

**KERR, RUSSELL AND WEBER, PLC**

By:*/s/ James E. DeLine*
    James E. DeLine (P45205)
    Matthew L. Powell (P69186)
500 Woodward Avenue, Suite 2500
Detroit, MI  48226
(313) 961-0200
jdeline@kerr-russell.com
mpowell@kerr-russell.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 27, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all filing users indicated on the Electronic Notice List through the Court's electronic filing system.

By:  */s/Seneca Love-Shorter*
Seneca Love-Shorter